## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

RANDY L. CATHCART,                    :

     Plaintiff,                    :

                                 Case No. 3:09cv00420

 vs.                    :

                                 District Judge Walter Herbert Rice

MICHAEL J. ASTRUE,                    :    Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,                    :

     Defendant.                    :

## REPORT AND RECOMMENDATIONS[1]

## I.    <u>Introduction</u>

Plaintiff Randy L. Cathcart, a former molding machine operator, brings this case challenging the decision of the Social Security Administration to deny his applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB).  The Court has subject matter jurisdiction to review the decision Plaintiff challenges.  *See* 42 U.S.C. §405(g).

The case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12), the administrative record, and the record as a whole.

---

[1]  Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

II.    **Background**

    A.    **Plaintiff's Health Problems and the Administrative Proceedings**

Plaintiff's health problems include diabetes mellitus with symptoms of peripheral neuropathy, high blood pressure, a left-foot deformity, chronic left shoulder and neck pain, arthritis, osteomyelitis, and hepatitis C.  *See* Doc. #8 at 24; *see also* Tr. 78.  He asserted during the administrative proceedings that on November 13, 2005 he became unable to work due to his health problems.  (Tr. 78).

  After various initial proceedings, the Social Security Administration assigned Administrative Law Judge Thomas R. McNichols II to review Plaintiff's DIB and SSI applications and supporting materials.  ALJ McNichols held two hearings, during which Plaintiff testified, and he later issued a written decision concluding that Plaintiff was not under a DIB- or SSI-qualifying disability.  (Tr. 18-29).  The ALJ consequently denied Plaintiff's applications.   Because the ALJ's decision later became the final decision of the Social Security Administration, the parties properly direct their attention in this case to the ALJ's decision.  *See* 42 U.S.C. §405(g).

    B.    **Plaintiff's Vocational Background and Testimony**

Plaintiff was 45 years old at the time of the ALJ's decision, and he was thus considered to be a "younger individual" for purposes of resolving his DIB and SSI

2

applications. *See* 20 C.F.R. §§404.1563(c); 416.963(c)[2]; *see also* Tr. 28, 74. He has a high school education. *See* 20 C.F.R. § 404.1564(b)(4); *see also* Tr. 82. His past employment involved work as a molding machine operator. (Tr. 79, 94-104).

Plaintiff testified during the administrative hearings that he stopped working in February 2002 because he had been convicted of sexual assault. He served a four-year prison sentence from 2002 to 2006. (Tr. 976-77).

Plaintiff testified that upon his release from prison his foot "was really messed up real bad." (Tr. 977). He explained, "[i]t was hard to walk on it because it's all deformed and everything, so the podiatrist ... put it back together the best she could, and that's where we're at right now." (Tr. 977). He further testified, "It's deformed as, like it swells up a lot ... sometimes it's every day, sometimes it's every other day, and then I get so far off balance...." (Tr. 978). When asked if he was able to walk, he answered: "No, I run into walls, I ... I'm like awkward, I'm off balance. See, and I'm on a bunch of medications for neuropathy and pain." *Id.*

Plaintiff also testified about his constant neck pain. He underwent neck surgery in 2000. He would still get "kinks" in his neck and "could only like go so far with it." (Tr. 979-80). He was more restricted moving his neck or head to his left than his right. He could move his head up and down "a little bit." (Tr. 980).

Plaintiff explained that diabetes caused neuropathy in his hands and feet. He

---

[2] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

noted, "this stuff is nasty.  I mean, it's like, it's like pins and needles, and it feels like somebody's taking a knife and going like this to the bone, and this is all day and night." (Tr. 981).  He uses his hands but drops things "all the time."  *Id*.  He emphasized, "I got, just a lot of, a lot of neuropathy, just a lot."  *Id*.  He rated his pain level due to neuropathy at eight on a zero to ten pain scale (zero equaling no pain; ten equaling the worst pain imaginable).  (Tr. 991-92, 1032).  He estimated that he had experienced neuropathy-related pain for eight to ten years.  (Tr. 992).

Diabetes also causes Plaintiff to frequently urinate.  He uses an insulin pump to treat his diabetes, but his blood glucose levels are not well controlled.  (Tr. 974, 982).  He testified, "There's days that ... I just have to lay in bed to get it under control....  It, what it does is it keeps a good controlled sugar..., you stay at home because you don't want to fall out, and then sometimes you fall out, you have to stay home from work ... because it takes like 24 hours just to get your head back together."  (Tr. 983).

Plaintiff explained that he has hepatitis C.  It causes him to feel like he has the flu all the time.  (Tr. 984).  He also had left shoulder pain which he thought was due to a torn tendon. (Tr. 984).  He could not raise his arm above his shoulder level.  (Tr. 991, 1029).

As to his mental health, Plaintiff experienced forgetfulness after hitting his head on a windshield during a car accident in 1989.  (Tr. 985).  He also struggled with anxiety. He explained, "I just get, like I, I'll get upset....  It just, makes me, sometimes, I just got to outburst, I don't know why.  I outburst a lot, you know what I mean, and people look at me like I'm weird because I say stuff...."  (Tr. 985-86).  Although he had received mental

4

health counseling, he stopped it because he "didn't think they were doing anything for me." (Tr. 986). He also said that he took Vistaril at one point for his psychological problems but it did not help; it just made him tired.[3] (Tr. 986-87).

Plaintiff estimated he could walk for one-half city block before left-foot pain would stop him. (Tr. 993, 1033). He could stand for 30 minutes at a time and sit for 1 hour at a time. (Tr. 993, 1034). He was able to use his arms, hands and fingers to perform most tasks. He acknowledged that he could lift 10-15 pounds using both arms and hands. (Tr. 994). He testified to get up the stairs he must crawl. (Tr. 995).

Plaintiff said that he cannot do his past work because it was too physical. *Id.* He did not think he could do sedentary level work because he requires ready access to restroom facilities. *Id.* When asked why he did not think he do any type of work, Plaintiff explained:

> It's because I'm always going to the bathroom, okay, I can't sit still because I got to go to the bathroom all the time. I'm always nervous, I get sick, and when I, like..., I'll get sick and say I can't make it into work because I got like flu-like symptoms or my sugar is too high or it's too low, and I got to try to get it balanced out....

(Tr. 1002).

As to his daily activities, Plaintiff rises at 7:00 a.m., does picture puzzles, watches television, reads, and might go fishing with a friend. (Tr. 1000-01, 1036). He has a valid

---

[3] The National Institutes of Health's website indicates that Vistaril® is a prescription medication used to treat allergies; nauseousness and vomiting caused by various conditions, including motion sickness; and anxiety. http://www.nlm.nih.gov (MedlinePlus database).

driver's license but drives only once per month.  (Tr. 973, 1022).  He cares for all of his personal needs and performs some basic household chores, and such as sweeping, making beds.  (Tr. 996, 1035).  He goes food shopping with his father "every once and a while." (Tr. 996).  When his foot gets sore while shopping, his sits on a bench and waits for his father.  *Id*.

Plaintiff attends church services twice a month.  He visits his sister "every once in a while."  (Tr. 997).  He tries to walk a little for exercise.  (Tr. 998). He denied any alcohol use for the past eight or nine years, but he also acknowledged that he been convicted of one DWI and one DUI within the previous eight or nine years.  (Tr. 998-99). He "quit all that" when he was incarcerated.  (Tr. 999).

### C.    Medical Source Opinions

**Florencio Reyes, M.D.**      Dr. Reyes was Plaintiff's primary care physician from January 5, 2006 to October 16, 2008.  (Tr. 180-90, 620-84).  Dr. Reyes treated Plaintiff for diabetes mellitus, type II; pain in his left foot and left arm; intermittent left anterior chest pain; sexual difficulty; and difficulty walking.  (Tr. 620).  Dr. Reyes referred Plaintiff to a podiatrist, a neurologist, and a diabetologist.  *Id.*

On October 20, 2008, Dr. Reyes opined that Plaintiff could stand/walk for a total of 4 hours per day and sit for a total of 2 hours per day.  (Tr. 622-23).  Dr. Reyes believed that Plaintiff could lift up to 10 pounds on a frequent basis and up to 50 pounds on an occasional basis.  *Id.*  Dr. Reyes wrote that Plaintiff "is not able also to handle average

stresses of daily life, especially at work.  He probably is not able to socialize like an

average individual of his age group.  He has not been able to perform gainful work

activity in a competitive work market on a sustained basis.  The duration of his inability

to work is anticipated to last indefinitely." (Tr. 620-21).

**Sushil Sethi, M.D.**     In February 2009 Dr. Sethi examined Plaintiff at the request of the

Ohio Bureau of Disability Determination.  (Tr. 809-22).  Dr. Sethi recognized that

Plaintiff had a history of diabetes and had been taking insulin since age 21.  (Tr. 809).  At

the time of Dr. Sethi's report, Plaintiff was age 45.  Dr. Sethi further noted that Plaintiff

had a history of peripheral neuropathy, diagnosed in 1997.  Dr. Sethi also addressed the

history of Plaintiff's diabetes as follows:

> Six years ago he started taking medications for diabetes.  He was under the
> care of Dr. Newman in Belmont Correctional Institute.  He states he was in
> prison for four years.  He has had a lot of problems with the foot.  He
> started getting infections.  Ultimately he thinks he developed osteomyelitis
> of the left foot.  When he came out he came under the care of a foot doctor,
> Dr. Holsapple.  Two years ago the doctor started treating him and debrided
> the left foot in the past.  Last October or so he felt that he may have broken
> his bone in the left foot and put him in a cast.  He has already completed 10
> weeks.  He has two more weeks to go before the casts will come off.  He
> came with a cast and was unable to examine left foot or leg.  Currently he
> does not have any infection or osteomyelitis.  His peripheral neuropathy is
> under control with medications.  He also receives insulin as a pump.

(Tr. 809).  Dr. Sethi reported that Plaintiff's neurological examination was essentially

normal with good motor strength and sensory perception.  Dr. Sethi opined that Plaintiff

was capable of lifting 10 pounds on a continuous basis.  According to Dr. Sethi, Plaintiff

could stand or walk for 1 hour each per day and he could sit for up to 8 hours per day.  He

7

concluded, "Based on my objective findings, the claimant's ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying and handling objects and traveling is moderately limited." (Tr. 811).

**Diane Manos, M.D.**    In October 2006 Dr. Manos reviewed the medical evidence for the Ohio Bureau of Disability Determinations. (Tr. 191-99). Dr. Manos thought that Plaintiff could lift and/or carry up to 20 pounds occasionally and 10 pounds frequently; could stand and/or walk about 6 hours in an 8-hour workday; could sit about 6 hours in 8-hour workday; and was limited in his lower extremities. Dr. Manos based her opinion on Plaintiff's diabetes mellitus, hypertension, osteomyelitis, hepatitis C, and neuropathy. Dr. Manos reported that Plaintiff has a history of diabetes mellitus and cellulitis with foot ulcers. A foot x-ray taken on July 7, 2006 showed multiple abnormalities including arthropathy, intraarticular fracture of the proximal phalanx, cystic changes and narrowing of joint spaces all metatarsals.

Dr. Manos further noted that Plaintiff has been treated at an emergency room for foot pain. He walked with a limping gait most of the time. His pain was treated with prescriptions. At the time of her review, Plaintiff has no ulcerations. Examination results on August 15, 2006 showed no leg swelling; normal lower extremity pedal pulse. Toenails were missing on 4 toes of his lower-left foot.

He had normal range of motion of his lower left extremity. Decreased sensation in lower left extremity. The record revealed that no ambulatory aids were used. His hypertension was controlled. Hepatitis C was diagnosed, but it did not appear to limit

functioning and he was not receiving treatment for this.

**Bill Smith, Ph.D.**    Dr. Smith evaluated Plaintiff on referral from Dr. Reyes in October and November 2008.  (Tr. 685-91).

During the evaluation, Plaintiff appeared to be somewhat distractible.  When there were extraneous noises outside of the testing office, his attention to and concentration on auditory stimuli appeared to be significantly reduced.  Dr. Smith noted that Plaintiff appeared to have intact expressive and receptive language abilities.  His speech was fluent, prosodic, grammatically intact, and non-dysarthric.  No word finding problems in conversational speech were noted.  Plaintiff was able to name pictures and objects without difficulty.  He was able to express himself verbally without difficulty.  Receptive language function appeared intact.  Plaintiff followed 2- and 3-step directions without difficulty.  His conversational skills were intact.  Dr. Smith noted that Plaintiff appeared to exert full effort on all testing tasks.  (Tr. 687).

Plaintiff indicated that he had difficulty sleeping through the night.  He got up at least 4 to 5 times per night.  He indicated difficulty with sleep due to constant rumination. Plaintiff reported his appetite as intact.  He noted his mood was somewhat irritable, depressed, frustrated, and anxious.  Affect was pleasant during the evaluation. Psychomotor rate was within normal limits.  No hallucinations or delusions were reported.  No suicidal ideation, intent, and/or plan were present.  Plaintiff denied hypomanic or manic episodes.  He also reported that he was easily frustrated and was bored due to not having sufficient activities to keep him busy during the day.  (Tr. 687).

9

WAIS-III testing resulted in the following IQ scores: verbal – 79; performance – 81; and full scale – 78.  Dr. Smith also reported that Wechsler memory testing placed Plaintiff in the 7th percentile in overall memory functioning.  (Tr. 688).

Dr. Smith diagnosed Plaintiff with borderline intellectual function.  (Tr. 690).  Dr. Smith noted, "Mr. Cathcart clearly has a significant history of mental health problems for which he has previously received treatment.  The patient's psychoemotional status was assessed using a clinical interview and based on this, the patient appears to have significant anxiety and depressive features.  It may be helpful for the patient to have a more thorough psychological evaluation to determine the extent and type of difficulties the patient is currently having psychoemotionally."  (Tr. 690).

Dr. Smith discussed counseling with Plaintiff.  Dr. Smith noted that "previous counseling had not helped and he prefers to deal with his psychoemotional problems on his own."  (Tr. 690-91).

### D.  <u>Vocational Expert Testimony</u>

A vocational expert testified at both administrative hearings.  (Tr. 1013-15; 1039-49).  He stated that Plaintiff's past work as a molding machine operator was unskilled and involved medium to very-heavy lifting.  (Tr.  1013, 1040).  He opined that a hypothetical person with Plaintiff's age, education, work experience, and residual functional capacity,[4] could perform 6,500 unskilled regional jobs, including jobs as a microfilm document

---

[4]  The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

preparer, lens inserter, and final assembler.  (Tr. 1040-41).

## III.    Administrative Review

### A.    "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  A "disability" consists only of physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70.

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.    ALJ McNichols' Decision

ALJ McNichols resolved Plaintiff's disability claim by using the five-Step sequential evaluation procedure required by Social Security Regulations.  *See* Tr. 21-29; *see also* 20 C.F.R. §404.1520(a)(4).  His most significant conclusions occurred at Steps 2 and 4.

11

He concluded at Step 2 that Plaintiff has the severe impairments of diabetes mellitus with associated symptoms of peripheral neuropathy, a left foot deformity, chronic left shoulder and neck pain, and arthritis. (Tr. 21).

At Step 4 the ALJ found that Plaintiff has the residual functional capacity to perform sedentary work[5] with the following restrictions:

> [Plaintiff] is restricted to standing and/or walking no more than two hours per eight-hour day and to no more than frequent reaching, handling, fingering, and pushing/pulling. The claimant is also restricted to only occasional climbing of stairs and is precluded from balancing, climbing ladders, ropes, and scaffolds and exposure to hazards. He is further precluded from performing work above shoulder level with his left upper extremity and from working on uneven surfaces.

(Tr. 22). As to Plaintiff's credibility, the ALJ concluded that his "medically-determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment...." (Tr. 27).

These conclusions, along with the ALJ's findings throughout his sequential evaluation, led him to ultimately conclude that Plaintiff was not under a disability and was, as a result, not eligible to receive DIB or SSI. (Tr. 29).

## IV.    <u>Judicial Review</u>

---

[5] Social Security Regulations categorize sedentary work as the least strenuous category of work ability. *See* 20 C.F.R. §404.1567(a)-(e). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." §404.1567(a).

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

13

*Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541,

546-47 (6th Cir. 2004)).


V.     **DISCUSSION**

   A.     <u>**The ALJ's Credibility Findings**</u>

                            **1.**

   Plaintiff contends that the ALJ "cannot justify a finding that the Claimant is

exaggerating the severity of his symptoms, just based upon visual observation during the

hearings." (Doc. #8 at 25). Plaintiff emphasizes that despite the mountains of evidence,

the pages of medical reports, the obvious objective findings by a variety of doctors, "the

ALJ makes the unbelievable finding that the Claimant 'does not appear to be in pain'

during the hearings." *Id.* (citing Tr. 21). Plaintiff further argues:

> The ALJ is not a physician, nor did the ALJ examine the Claimant.
> To make such a determination is an insult, not only to the Claimant, but to
> the physicians who have treated the Claimant for the last 8-10 years. Can
> there really be any doubt that the Claimant is in pain on a daily and hourly
> basis based upon every individual from which he suffers – foot, knees,
> shoulder, neck – neuropathy in all extremities[?] The SSA's own examining
> doctor, Dr. Diane Manos indicated in October, 2006 that the Claimant's
> symptoms were consistent with his impairments and that the claims of Mr.
> Cathcart were in fact <u>credible</u>. *See* Exhibit 6F, p. 197. The problems have
> only intensified over the last three years....

(Doc. #8 at 25)(emphasis in original). Plaintiff also points out,"Even the ALJ's own

examining doctor, Dr. Suchil Sethi..., did not make such a ridiculous conclusion in his

report. See, Exhibit 36, TR pp.809-822." (Doc. #8 at 26). Plaintiff also does not find a

medical source opinion in the administrative record claiming that he was not in pain or

was grossly exaggerating his symptoms. *Id.*

The Commissioner argues, "the ALJ's decision reflects his careful consideration of the appropriate regulatory factors, required in assessing the credibility of a claimant's complaints of disabling symptoms." (Doc. #11 at 42).

**2.**

Pain or other symptoms may be severe enough to constitute a disability, if caused by a medical impairment. *See Kirk v. Sec'y of Health & Human Serv.,* 667 F.2d 524, 538 (6th Cir. 1981) (pain alone may constitute a disability); *see also* 20 C.F.R. §404.1529. When evaluating pain or other symptoms, ALJs are required under the Regulations to consider all evidence, including medical history, medical signs and laboratory findings, the claimant's statements, and treating and other medical source opinions. 20 C.F.R. §404.1529(c)(1). Although the Regulations concerning pain and other symptoms are lengthy, the Sixth Circuit Court of Appeals has enunciated the applicable standard in "a more succinct" two-part analysis. *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994). Part one considers "whether there is objective medical evidence of an underlying medical condition." *Id.* (citation omitted). If such objective medical evidence exists, then part two requires consideration of two alternative questions:

1.   Whether objective medical evidence confirms the severity of the alleged pain [or other symptom] arising from the condition; or

2.   Whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain [or other symptom].

15

*Id.* (citation omitted).  Neither *Felisky's* two-part test nor the Regulations upon which it is based require objective medical evidence of pain itself.  *Id.* at 1039.  The Regulations promise, "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."  20 C.F.R. §404.1529(c)(2).

Consequently, the Regulations require ALJs to consider a list of factors, including the claimant's daily activities; the location, duration, frequency and intensity of pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment, other than medication, obtained for symptom relief; any measures used to alleviate pain (*e.g.*, lying flat, standing 15 or 20 minutes every hour, sleeping on a board, *etc.*); and other factors concerning the claimant's functional limitations. 20 C.F.R. § 404.1529(c)(3)(I)-(vii); *see* Social Security Ruling 96-7p, 1996 WL 374186.

An ALJ's findings concerning the credibility of a claimant's testimony about his or her pain or other symptoms "are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  "Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Id.*  The Commissioner, speaking through the Rulings, mandates in part:

The reasons for the credibility finding must be grounded in evidence

and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'  It is also not enough for the adjudicator to simply recite the factors that are described in the regulations for evaluating symptoms.  The determination must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Social Security Ruling 96-7p, 1996 WL 374186.

### 3.

The ALJ assessed Plaintiff's credibly as follows:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.  An assessment of all relevant factors does not establish that the claimant is limited to the extent that he is "disabled" within the meaning of the Social Security Act.  Moreover, the claimant's daily activities and levels of functioning in the performance of routine daily tasks are consistent with an ability to function in a competitive work environment performing job duties at the sedentary level of exertion with the additional functional restrictions set forth above.

The claimant has a valid driver's license and is able to drive whenever necessary.  He is able to care for all of his own personal needs and can perform some basic household chores such as sweeping, making beds, and shopping at Wal-Mart.  He attends church services two times per month, is visited by others in his home, and enjoys fishing.  He walks a little for exercise.  The claimant denied any alcohol use for the past eight or nine years but admitted that he had previously been convicted of a DUI offense.  On a typical day, the claimant rises at 7:00 AM, does picture puzzles, watches television, reads, and may go fishing with a friend.  Such activities are consistent with an ability to perform sedentary level work within the confines of the additional restrictions described above.  They are clearly inconsistent with total disability.  They are similarly inconsistent with the

17

medium and light exertional capabilities of the claimant found by reviewing physicians in June and October 2006.

The claimant's residual functional capacity for a reduced range of sedentary work takes into consideration the location, duration, frequency, and intensity of the claimant's alleged symptoms, as well as precipitating and aggravating factors.  The claimant has undergone two surgeries on his left foot as well as a remote prior cervical fusion.  However, the remainder of his treatments involved only periodic, conservative measures and were by no means indicative of total disability.  His blood sugars have some [sic] under good control with the use of insulin pump therapy, even though there is some evidence of less-than-full compliance with his diabetes management regimen.  The claimant does take some prescription medications. However, there is no medical evidence that he experiences any side effects from his medications or treatments which would prevent him from working.  He has not recently been hospitalized for any reason.  The above-described residual functional capacity assessment for a reduced range of sedentary work is consistent with the testimony and specific diagnoses of the treating and examining sources.  Therefore, the claimant's allegations of total disability are found to be disproportionate and less-than-credible.

(Tr. 27, citation to record omitted).

**4.**

The ALJ correctly described the legal criteria applicable to evaluating Plaintiff's credibility and he accurately cited applicable Regulations, such as 20 C.F.R. 404.1529, and applicable Social Security Rulings, such as Ruling 96-7p, 1996 WL 374186.  *See* Tr. 26-27.  In doing so, the ALJ did not err as a matter of law.  It therefore remains to determine whether substantial evidence supports the ALJ's decisions, particularly in light of Plaintiff's contentions.

Plaintiff objects to the ALJ's observation that he "appeared to exaggerate the severity of his symptoms when he testified at both hearings."  (Tr. 21).  Although the ALJ

made this observation when describing Plaintiff's testimony, he did not specifically incorporate it into his assessment of Plaintiff's credibility. *See* Tr. 21, 26-27. Assuming that the ALJ fully included his observations of Plaintiff when assessing his credibility, this was not error. "In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his ... own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements." Social Sec. Ruling 96-7p, 1996 WL 374186 at *5. Although the adjudicator is "not free to accept or reject the individual's complaints solely on the basis of such personal observations, *id*. at *8, the ALJ did not do so when assessing Plaintiff's credibility. The ALJ instead assessed Plaintiff's credibility as Ruling 96-7p allows by considering his "observations in the overall evaluation of..." Plaintiff's credibility. *Id*. This is readily seen in the detailed assessment, quoted above in §V(A)(3), by the ALJ.

The ALJ carefully considered Plaintiff's pain testimony in light of the objective medical evidence and the required regulatory factors. The ALJ properly considered his daily activities, and certain inconsistencies within Plaintiff's own statements and testimony. *See* §V(A)(3). The ALJ, moreover, did not fully reject Plaintiff's pain testimony. Instead, he limited Plaintiff to sedentary work – the least strenuous category of work under the Regulations, 20 C.F.R. §404.1567(a)-(e) – when determining his residual functional capacity. *See* Tr. 22. The ALJ further accommodated Plaintiff's pain in several ways: limiting to standing and/or walking no more than two hours per

19

workday; limiting him to no more than frequent reaching, handling, fingering, and pulling; limiting him to only occasional stair climbing; precluding him from balancing, climbing ropes, ladders, scaffolds; and precluding him from working on uneven surfaces and from performing over-the-shoulder work. (Tr. 22).

Accordingly, Plaintiff's challenges to the ALJ's credibility determinations lack merit.

**B.     <u>Medical Source Opinions</u>**

**1.**

Plaintiff argues that the representation of the ALJ that the restrictions placed upon Plaintiff's ability to work, are consistent with the ability to perform sedentary work is not supported by the medical records. *Id.* at 26. Plaintiff contends that the ALJ erred in weighing medical source opinions. He emphasizes that the neuropsychological evaluation and conclusions by Dr. Smith should not be completely dismissed and Plaintiff's intellectual deficits should be considered as a severe impairment. *Id.* at 27. Finally, according to Plaintiff, the ALJ "goes to great lengths to eliminate from consideration" the opinion of treating physician Dr. Reyes and fails to provide valid reasons for rejecting Dr. Reyes' opinions. *Id.* at 6.

The Commissioner maintains that the ALJ properly articulated his weighing of the opinions provided by Drs. Sethi, Reyes and Smith as well as the state agency physicians' opinions. *Id.* at 8-10.

20

**2.**

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ. *Blakley,* 581 F.3d at 406 (6th Cir. 2009); *see Wilson*, 378 F.3d at 544 (6th Cir. 2004). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Id.*

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §404.1527(d)(1). Yet the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in

21

disability claims under the [Social Security] Act." Social Security Ruling 96-6p.

Consequently, opinions of one-time examining physicians and record-reviewing

physicians are weighed under the same factors as treating physicians including

supportability, consistency, and specialization. *See* 20 C.F.R. §404.927(d), (f); *see also*

Ruling 96-6p at *2-*3.

       The Commissioner views non-treating medical sources "as highly qualified

physicians and psychologists who are experts in the evaluation of the medical issues in

disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996

WL 374180 at *2. Yet the Regulations do not permit an ALJ to automatically accept (or

reject) the opinions of a non-treating medical source. *See id*. at *2-*3. The Regulations

explain, "In deciding whether you are disabled, we will always consider the medical

opinions in your case record together with the rest of the relevant evidence we receive."

20 C.F.R. §404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate

non-treating medical source opinions under the factors set forth in §404.1527(d)

including, at a minium, the factors of supportability, consistency, and specialization. *See*

20 C.F.R. §404.1527(f); *see also* Ruling 96-6p at *2-*3.

**3.**

       The ALJ provided a detailed and well-supported description of the medical source

opinions and records. *See* Tr. 22-26. Contrary to Plaintiff's contentions, the ALJ

provided sufficient information to show that he weighed the medical source opinions as

the Regulations required. The ALJ set out the correct legal criteria applicable under the

treating physician rule and correctly recognized that if controlling weight is not due a treating physician's opinion under that criteria, the Regulations require an ALJ to continue weighing the treating physician's opinions under a number of factors. *See* Tr. 25-26. The ALJ then accurately listed those factors in a manner consistent with Social Security Regulations and case law. *Id.*; *see* 20 C.F.R. §404.1527(d)(2)-(6); *see also Wilson*, 378 F.3d at 544.

In challenging the ALJ's findings, Plaintiff argues that the ALJ should have relied on the opinion of Dr. Reyes, who opined that Plaintiff was unable to work. (Doc. #8 at 29). The ALJ properly declined to place controlling or substantial weight on Dr. Reyes' disability opinion because it was not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and was "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007). Dr. Reyes' opinion that Plaintiff could not perform sedentary or light work appears in boxes he checked without any supporting explanation or reference to medical evidence. (Tr. 623). His letter to counsel was conclusory and provides no significant insight into Dr. Reyes' reasoning. (Tr. 620-21). The ALJ, moreover, did not err by discounting Dr. Reyes' opinion that Plaintiff could not work due to his alleged mental impairment, because Dr. Reyes is not certified in the area of mental health treatment. (Tr. 26). This constituted an application of the "specialization" factor permitted by the Regulations. *See* 20 C.F.R. §404.1527(d)(5).

The ALJ partially based his assessment of Plaintiff's residual functional capacity

23

on objective medical evidence and the opinions of Dr. Sethi. The ALJ explained:

> Dr. Sethi examined the claimant on February 10, 2009, and diagnosed both insulin-dependent diabetes mellitus and associated peripheral diabetic neuropathy. Dr. Sethi specifically noted the claimant's history of diabetic foot infections, but his neurological examination of the claimant was essentially normal with good motor strength and sensory perception. Dr. Sethi considered the claimant capable of lifting 10 pounds on a "continuous" basis and also stated that the claimant could stand or walk for one hour each per day and that he could sit for up to eight hours per day. Such limitations are indicative of an ability to perform sedentary level work and are consistent with the claimant's own testimony at the hearing that he is able to lift 10-15 pounds.

(Tr. 22). The ALJ did not err when assessing Dr. Sethi's opinions because he did not accept it full and instead included in Plaintiff's residual functional capacity greater restrictions than those set by Dr. Sethi. Although Plaintiff criticizes Dr. Sethi's report and findings as inaccurate or wrong, *see* Doc. #8 at 27-28, he has not demonstrated that the ALJ applied incorrect legal standards to Dr. Sethi's opinion and has not shown that substantial evidence fails to support the ALJ's findings with regard to Dr. Sethi's opinions. Instead, Dr. Sethi's report explains his examination and findings. For example, he noted that neurological exam "shows cranial nerves II through XII are intact. Motor sensory is normal. Deep tendon reflexes are normal. Proprioception is normal. Romberg test is negative." (Tr. 811).

Plaintiff also argues that the ALJ failed to include any intellectual deficits among Plaintiff's severe impairments. Step 2 of the sequential analysis – determining whether the claimant has a severe impairment – presents "a *de minimis* hurdle in the disability determination process.... Under the ... *de minimis* view, an impairment can be considered

24

not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The purpose of this very low evidentiary hurdle is to "screen out claims that are 'totally groundless.'" *Higgs*, 880 F.2d at 862 (quoting in part *Farris v. Secretary of Health and Human Services*, 773 F.2d 85, 89-90 (6th Cir. 1985)). Plaintiff refers to the assessment of psychologist Dr. Smith, who diagnosed Plaintiff with borderline intellectual functioning. (Tr. 685-91). However, the ALJ rejected this as a severe impairment because Plaintiff has made no attempt to obtain counseling or other treatment. (Tr. 27). The ALJ further found that Plaintiff retains sufficient cognitive ability to perform at least unskilled work, and there is no evidence that he has any organically-based memory deficits. *Id.* Plaintiff failed to initially claim disability due to any mental impairments. Notwithstanding the above, Plaintiff fails to identify any additional work limitations caused by his alleged intellectual deficits.

Accordingly, Plaintiff's challenges to the ALJ's assessment of the medical source opinions and his challenges to the ALJ's assessment of his residual functional capacity lack merit.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be affirmed; and

2.      The case be terminated on the docket of this Court.


January 10, 2011                                          ___s/Sharon L. Ovington___
                                                         Sharon L. Ovington
                                                         United States Magistrate Judge

26

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).